# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

No. 4:13-CV-57-FL

| | |
|---|---|
| SHARON GUTHRIE, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-17, DE-19] pursuant to Fed. R. Civ. P. 12(c). Claimant Sharon Guthrie ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her applications for a period of disability, Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding the case to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability, DIB on April 1, 2010, alleging disability beginning December 15, 2007. (R. 29; 165). Her claim was denied initially and upon reconsideration. (R. 29; 73-74). A hearing before the Administrative Law Judge ("ALJ") was held on July 11, 2011, at which Claimant was represented by counsel and a witness and a vocational

expert ("VE") appeared and testified. (R. 29; 40-71). On August 23, 2011, the ALJ issued a decision denying Claimant's request for benefits. (R. 26-37). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 22-25), and submitted additional evidence as part of her request (R. 4). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on January 24, 2013. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq*., is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in

2

crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of

the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other

work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies

four broad functional areas in which the ALJ rates the degree of functional limitation resulting from

a claimant's mental impairment(s): activities of daily living; social functioning; concentration,

persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required

to incorporate into his written decision pertinent findings and conclusions based on the "special

technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) improper assessment of

Claimant's credibility (Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 9); (2) failure to

give proper weight to Claimant's treating physicians' medical opinions (Pl.'s Mem. at 14); and (3)

3

failure to properly apply the special technique for mental impairments, (Pl.'s Mem. at 20).

## FACTUAL HISTORY

## I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 31). Next, the ALJ determined Claimant had the following severe impairments: degenerative disc disease and heart disease. (*Id.*) However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the additional restrictions of occasional climbing, balancing, stooping, kneeling, and crawling, avoiding exposure to hazards such as machinery and heights, and a sit/stand option with one to two minutes of standing and stretching every hour. (R. 34). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 34-36). At step four, the ALJ concluded Claimant had the RFC to perform the requirements of her past relevant work. (R. 36).

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 44 years old and unemployed. (R. 50). Claimant is a high school graduate. (R. 50; 171). Claimant was last employed as a secretary with a real estate/mortgage company for approximately six (6) years, where her duties included answering phones, transcribing messages from an answering machine, setting up and using a copy machine, filing loan applications, making phone calls to other banks, and running errands. (R. 50-52; 171). She lifted, at most, a ream of paper and never had to lift heavy storage boxes while working as a secretary. (R. 52). Claimant's past work experience also includes working as a reservationist, a rural mail carrier, and a waitress, dish washer, and busser. (R. 52; 56; 171).

Claimant explained numerous medical conditions supporting her disability claim and her inability to work full-time. She has a history of severe lower back pain and has had two back surgeries, first in 2000 and the second in 2008. (R. 50; 52-53; 57; 59; 260; 385). Claimant testified that the first surgery was needed because she repeatedly lifted up to 70 pounds while working as a temporary rural mail carrier. (*Id.*) During subsequent work as a secretary, she said that her coworkers were aware of her back surgery and lifted heavier items for her. (R. 52). Her need for a second back surgery was cited as a reason that she could no longer work as a secretary. (R. 50). She also admits that she was laid off approximately six (6) months before her surgery was scheduled to occur. (R. 51). The second back surgery involved incisions in both the front and back of her body and attempted to correct a degenerated disc. (R. 46; 385). After this second surgery, Claimant attempted to return to her job but was unable to complete her duties without crying because of the intense pain in her back. (R. 52-53). She will need a third back surgery in her thoracic and cervical

5

area to install more rods. (R. 46).

Claimant testified that she is unable to work due to pain associated with other parts of her body. She has right arm and hand pain (R. 57), carpal tunnel (R. 57-58), arthritis (R. 58), left leg sciatica (R. 58), muscle spasms (R. 61), and depression (R. 57; 61). She described crying herself to sleep because of pain associated with both her back and other areas (R. 60), the need to lie down for an hour or two during the middle of the day (R. 62), and side effects from her medications, including light-headedness, nausea, moodiness, and diarrhea (R. 61-62). She has trouble gripping items with her right hand and has problems dropping items held in her right hand. (R. 57). Claimant had a pacemaker installed in 1991 and has had two miscarriages. (R. 56).

To address these problems, Claimant has sought a number of treatment options. As mentioned above, she has had multiple back surgeries. She also had carpal tunnel surgery in her right hand and says that it has helped alleviate some, but not all, symptoms. (R. 57-58). She has taken multiple medications, including Percocet and Hydrocodone to manage pain throughout her body. (R. 61). She has also sought the help of a pain specialist and family doctors, who have attempted to diagnose her problems using different tests. (R. 58-59). She has received injections to fight pain in the past as well. (R. 58-59). She attempted physical therapy in the past, to no avail, but planned to restart it the week of the hearing. (R. 60). Claimant has also used TENS units to attempt to reduce pain in her back. (R. 60).

Despite these ailments, Claimant describes a variety of daily activities. She testified that she lives in a three-story home and that her bedroom is on the middle floor, requiring daily ascent of at least one flight of stairs. (R. 46). She retains a driver's license, drives distances of approximately ten (10) miles up to three (3) times a week, and visits places such as the mall, bank, and grocery

6

store. (R. 48). She attended church with some regularity after the alleged onset date. (R. 49; 55). She walks in her backyard swimming pool and does exercises recommended by her physical therapist. (*Id.*) She can sweep, load the dishwasher, and help prepare meals. (R. 53).

## III. Witness' Testimony at the Administrative Hearing

Randy Guthrie, Claimant's husband, testified at the Administrative Hearing. (R. 63-66). Mr. Guthrie, along with Claimant's mother, son, and daughter, has helped support Claimant over the past seven (7) years. (R. 47-48; 60; 64). He has been married to Claimant for 20 years and sees her every day. (R. 63-64). Mr. Guthrie testified that Claimant experiences pain 90 percent of the time, and that her pain ranges "from light to moderate to where [Claimant] has to lie down." (R. 65). According to Mr. Guthrie, if Claimant attempts to do any housework, she needs to lie down with a heating pad for a couple of hours afterwards. (R. 63-64). Mr. Guthrie stops by the house around lunchtime regularly and often finds his wife in bed. (R. 64). Because Claimant was limited in her abilities to cook, the family often eats out or orders food to be delivered. (R. 64-65).

Mr. Guthrie also testified about the side effects of Claimant's medications. He states that certain unspecified medications can make his wife emotional at times. (R. 65). According to Mr. Gurthrie, Claimant regularly takes muscle relaxers and Tylenol to help relieve her pain. (*Id.*) He also described how Claimant is sleepy and groggy on medication and is generally unable to be "up or about" after taking it. (R. 66).

## IV. Vocational Expert's Testimony at the Administrative Hearing

Mark Leaptrot testified as a VE at the administrative hearing. (R. 66-71). After the VE's testimony regarding Claimant's past work experience (R. 68-69), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and

7

posed two hypothetical questions (R. 69-70). First, the ALJ asked whether an individual with Claimant's education and experience could perform either of Claimant's past occupations given that the individual has the physical capacity to perform light work involving only occasional climbing, balancing, stooping, kneeling, and crawling, avoiding concentrated exposures to hazards, and a sit/stand option allowing the individual one to two minutes of stretching every hour. (R. 69). The VE testified that Claimant's past relevant work as a secretary would fall within the described parameters. (R. 68-69). Second, the ALJ asked whether, assuming all of the previous restrictions, but adding a mandatory 30 minute lay-down period every hour, the same work would be available. (R. 69). The VE testified that a secretary position would not be available with that additional restriction. (R. 70).

## DISCUSSION

### I. The ALJ's Assessment of Claimant's Credibility

Claimant contends that the ALJ improperly assessed Claimant's credibility. Pl.'s Mem. at 9. Specifically, Claimant finds fault with the ALJ's failure to consider evidence of the extensive measures Claimant took to seek treatment for her ailments. *Id.* at 10. Further, Claimant argues that the following five specifically enumerated reasons for the ALJ's credibility determination are not supported by substantial evidence: (1) Claimant's collection of unemployment benefits; (2) that Claimant left her last job for reasons other than her ailments; (3) Claimant's need to lie down during the day is not supported by objective medical evidence; (4) Claimant alleged right hand problems despite successful carpal tunnel surgery; and (5) that Claimant has not required recent hospitalization for her condition. *Id.* at 11-14.

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v.*

8

*Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *See Craig*, 76 F.3d at 593-94. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.*; *see also* SSR 96-7p, 1996 WL 374186, at \*2 (July 2, 1996). If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *See Craig*, 76 F.3d at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other than medication, for relief of pain or other symptoms and functional restrictions. *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at \*3. The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See Craig*, 76 F.3d at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at \*3.

In assessing Claimant's allegations, the ALJ made the step one finding that Claimant's medically determinable impairments could cause her alleged symptoms. (R. 34). At step two,

9

however, he found Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms not to be fully credible to the extent that they conflicted with his RFC determination. (*Id.*) The ALJ listed a number of specific reasons for making that finding: (1) Claimant's collection of unemployment benefits after the alleged date of onset certified that she was available and willing to work; (2) a number of medical indicators, including full muscle strength, heart problems under control of a pacemaker, and a treating physician's opinion that Claimant could lift up to 20 pounds, suggest that Claimant is not as limited as she contends; (3) Claimant left her last job because she was laid off and not due to physical ailments; (4) there was no medical cause for Claimant's alleged need to lie down for 30 minutes during the day; (5) Claimant complains of right arm pain but medical notes indicate a successful carpal tunnel release; (6) Claimant's lack of recent hospitalization due to her condition indicate that the symptoms are not as severe as alleged; and (7) Claimant's daily activities suggest higher functionality than she claims. (R. 34-35).

## A. Failure to Consider Full Scope of Treatment Sought by Claimant

Claimant first suggests that the ALJ erred in failing to consider the full range of treatment options sought and attempted by Claimant. Pl.'s Mem. at 10-11. The ALJ states that in making his determination of Claimant's credibility and determining her RFC, he considered the entire record and all evidence. (R. 34). At step two of the sequential analysis, the ALJ thoroughly, though not exhaustively, recounts the treatment sought by Claimant in attempting to reduce her back pain and limit associated symptoms, including back injections, surgery, medication regimens, and electromyography. (R. 31-33). Contrary to Claimant's assertion, there is no requirement that the ALJ recite every piece of evidence in order for it to be determined that it was considered. *See Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762, n.10 (4th Cir. 1999) ("If a reviewing court can

10

discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied") (quoting *Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs*, 137 F.3d 799, 803 (4th Cir. 1998)). The extensive review of the medical evidence at step two indicates that the ALJ properly considered the entire record in making his determinations. Therefore, Claimant's first assignment of error is without merit.

## B. Unemployment Benefits

Claimant's second assignment of error is that the ALJ considered Claimant's receipt of unemployment benefits after her alleged onset of disability as one of his specific reasons for finding her testimony not credible. Pl.'s Mem. at 11-12. The ALJ found that in order to receive those benefits, Claimant had to certify that she was available and able to work. (R. 34; 156). That statement indicated to the ALJ that Claimant was not as disabled as she alleged. (*Id.*) The court finds no error with the ALJ's analysis here.

An application for unemployment benefits is one of many factors for an ALJ to consider in making a claimant's credibility determination. *Davis v. Colvin*, No. 5:13-CV-189-FL, 2014 WL 268700, at \*6 (E.D.N.C. Jan. 23, 2014); Memorandum of Chief Administrative Law Judge Frank A. Cristaudo, August 9, 2010, R. 250 ("application for unemployment benefits is evidence that the ALJ must consider together with all of the medical and other evidence"). A claimant must prove disability by, among other things, statements made about his or her impairments, restrictions, efforts to work, and any other relevant statements. 20 C.F.R. § 404.1512(b)(3); *See Craig*, 76 F.3d at 595. While the ALJ may consider applications for unemployment in making a credibility assessment, the ALJ may not expressly or implicitly bar the claimant from receiving DIB because the claimant received such benefits. *See Davis*, 2012 WL 268700 at \*6 ("While [receiving unemployment

11

benefits] does not automatically preclude Claimant from being "disabled," it is a factor the ALJ may consider . . . since this reflects on a claimant's ability to work"); *see also, Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999) (holding that Social Security claims are not mutually exclusive from claims under the ADA, which requires an ability to work); SSR 00-1c, Disability Insurance Benefits – Claims Filed Under Both the Social Security Act and the Americans With Disabilities Act, 65 FR 1215-01 (adopting *Cleveland* decision as Social Security Administration policy). North Carolina law, however, specifically requires that an applicant for unemployment benefits signify that he or she is not receiving or applying for disability benefits. *See* N.C. Gen. Stat. § 96-14.9(c); *Faulcon v. Colvin*, No. 4:12-CV-43-D, 2013 WL 1881024, at \*4 (E.D.N.C. May 3, 2013).

Here, the ALJ considered Claimant's collection of unemployment benefits after the alleged onset of her disability. (R. 34). There is no indication that the ALJ denied Claimant benefits solely because she had collected unemployment during her period of supposed disability. Instead, the ALJ's decision reflects a proper consideration of Claimant's having held herself out as being ready and able to work as one of many factors. (*See* R. 34 ("drawing unemployment benefits, which claimant was only eligible for if she was available and able to work . . . indicates claimant was not as [disabled] as she alleges.")). Therefore, Claimant's second assignment of error is without merit.

## C. Leaving Job for Reasons other than Alleged Disability

Claimant's third assignment of error is that the ALJ's determination that Claimant left her last job for reasons unrelated to her claimed disability is not supported by substantial evidence. Pl.'s Mem. at 12-13. The ALJ stated "[i]n fact, leaving her last job was not due to a physical reason." (R. 35). The finding was made by the ALJ in the course of stating a list of reasons for failing to find

12

Claimant's statements totally credible. (*Id.*). The court finds that the ALJ's determination is supported by substantial evidence and is not grounds for reversal.

Claimant testified that she left her job on December 15, 2007. (R. 51). She gave two reasons for the end of her employment: that she was laid of with a number of other employees and that her back had given her problems to the point that she had already scheduled back surgery. (*Id.*) The record contains substantial evidence supporting the ALJ's finding, despite conflicting with Claimant's testimony. First, claimant visited Dr. Joseph Nutz, her general physician on December 10, 2007, five days before her last date of employment. (R. 457). During that appointment, Claimant complained of a variety of sinus problems, fever and congestion, a mild cough, facial pain, and headache. (*Id.*) She did not complain of any back pain. (*See id.*) Her first complaint of back pain around this time was during her next visit to Dr. Nutz on January 9, 2008. (*Id.*) Two days later, she returned to Dr. Nutz, still complaining of pain in the same area. (R. 456). She was referred to Dr. Ashraf Guirgues for treatment about two weeks later. (R. 431-35). During her initial meeting with Dr. Guirgues on January 24, 2008, Claimant stated that her back pain had begun two weeks earlier when she lifted a heavy box and twisted. (R. 435). These statements indicate that back pain was not a consideration for Claimant when she left the workforce and only became relevant afterward.

Further, Claimant's subsequent treatment under Dr. Guirgues indicates that her surgery had not been planned as of December 15, 2007. During her next appointment with Dr. Guirgues, on March 11, 2008, Claimant was first presented with the option of having surgery to alleviate her then-current back problem. (R. 380). Three days later, Claimant was seen again by Dr. Guirgues to review her questions about the proposed surgery. (R. 381). On April 28, 2008, Claimant finally

13

agreed to pursue "surgical intervention," five months after she left her secretarial job. (R. 382). The surgery was finally performed on May 19, 2008. (R. 385-93). These statements are substantial evidence that Claimant left her job because she was laid off and not because of back troubles and that her surgery was not planned until long after she had left the work force. Therefore, the ALJ's consideration of this factor in making his credibility assessment is without error.

## D. Insufficient Medical Evidence to Support Necessity of Lying Down

Claimant's fourth assignment of error is the ALJ's consideration that her need to lie down for 30 minutes during each day was not supported by the medical evidence in the case. Specifically, the ALJ found that "[t]he claimant says she has to lie down during the day but there is no indication that there is a medical cause for this complaint." (R. 35). That finding is factually inaccurate. The ALJ found that Claimant's ailments could cause the type of symptoms that she alleges. (R. 34). That finding, by itself, is enough to show that there is a medical cause, and one that the ALJ recognizes, for Claimant's need to lie down during the day. The record shows, however, that Dr. Nutz, who regularly saw the claimant for her back problems and other health issues, recommended that course of treatment to help limit the pain she experienced. (R. 682). Dr. Nutz noted that lying down would help take weight off of her spine and help relieve some of her symptoms. (*Id.*) Her doctor recommended lying down in response to persistent complains of back pain, which indicates a medical cause for her need to do so.[2] The court finds that the ALJ's finding in this regard is not supported by substantial evidence and does not support the ALJ's credibility analysis.

## E. Right Hand Problems Despite Successful Carpal Tunnel Surgery

---

[2]This finding is also significant in that the ALJ questioned the VE regarding an additional limitation of lying down for thirty minutes every hour to apply heat to the back. The VE responded that this limitation would preclude competitive employment. (R. 69-70).

Claimant's fifth assignment of error is the ALJ's consideration of Claimant's complaints of right hand problems even though medical notes describe a successful carpal tunnel surgery. (R. 35). The ALJ's finding as to this fact is not supported by substantial evidence. Claimant had carpal tunnel surgery on January 25, 2011. (R. 582). The treatment notes do indicate that the surgery was successful and that Claimant tolerated the procedure well. (*Id.*) The record indicates, however, that Claimant experienced increasing problems in her right hand and shoulder post-surgery. During her first check-up, one week after the surgery, she stated that the numbness she had experienced before had largely been resolved. (R. 658). During a follow-up examination approximately a month later, however, the treatment notes indicate increased numbness in Claimant's right hand. (R. 656). She also noted right shoulder pain despite having a full range of motion. (R. 656-57). When she testified at the hearing on July 11, she noted an inability to grip, no improvement in strength, and some continued numbness in her right hand, though an improvement over her pre-surgery condition. (R. 57-58). The ALJ's characterization of Claimant's carpal tunnel surgery as successful ignores post-surgery check-ups insisting continued problems with Claimant's right hand and shoulder. Accordingly, this finding is not supported by substantial evidence and does not support the ALJ's credibility analysis.

## F.     No Recent Hospitalization Required

Claimant's sixth and final assignment of error regarding the ALJ's credibility assessment is the ALJ's consideration of Claimant's lack of recent hospitalization regarding the alleged ailments. Pl.'s Mem. at 14. The ALJ stated that "[i]n fact, [Claimant] has not required any recent hospitalization for any condition." (R. 34). This finding is not supported by substantial evidence and is factually incorrect. Exhibit 16F is an emergency room record from Carteret General Hospital,

15

documenting Claimant's presentment to the ER due to a back injury on April 25, 2011. (R. 640-646). Claimant was subsequently scheduled for a re-evaluation with her back specialist, Dr. Guirgues. (R. 645). Further, the record indicates that at the time of the hearing, Claimant was weighing her options with regard to pursuing breast reduction surgery, which doctors opined might help alleviate her symptoms. (R. 677). These visits with her doctors and trip to the emergency room merely two months before the hearing are at odds with the ALJ's finding that no recent hospitalization was required for her condition. This reason, therefore, is not supported by substantial evidence and was improperly used in discounting Claimant's credibility.

## G. Other Factors in the ALJ's Credibility Assessment

The ALJ also considered a number of other factors in making his credibility assessment. The most prominent of these is that a number of medical indicators, including full muscle strength, heart problems under control with a pacemaker, and her treating back physician's opinion that she could lift up to 20 pounds, suggested to the ALJ that Claimant's functional limitation allegations were overstated. (R. 35). The record indicates that Claimant had full strength and range of motion in her right arm and wrist after having carpal tunnel surgery in 2011 (R. 654-57) and in various tests of her back after her 2008 back surgery (*see, e.g.*, R. 562). Given that she subsequently complained about pain in that same area and sought treatment for that pain, it is difficult to determine whether that is still the case. Nonetheless, that particular assertion is supported by substantial evidence. The control of Claimant's heart problems by a pacemaker is undisputed in this case. Finally, the ALJ considered Dr. Guirgues' opinion that Claimant could lift up to 20 pounds after having had back surgery. That particular diagnosis was made on February 19, 2009, about nine months after Claimant had her second back surgery. (R. 398-400). Notably, that was about two years before the hearing at which

16

she testified that such lifting was impossible for her. Further, Claimant was instructed against heavy lifting after that point (R. 682-83), sought additional treatments, such as injections into her neck and back (R. 405-413; 568; 581; 688), and contemplated further surgical procedures to help correct her back problems, (R. 677; 684 (suggesting claimant should consider breast-reduction surgery)).

The ALJ also considered Claimant's daily activities in reaching his credibility determination. (R. 35). He considered the layout of Claimant's home, which requires her to climb a flight of stairs to reach her bedroom. (R. 35; 46-47). The ALJ also considered that Claimant regularly attended church (R. 35; 49; 55) though did not note that she testified that she no longer felt able to (R. 54) and that when she had gone, she was not able to sit through the whole service because of her pain (R. 55). The ALJ considered that Claimant drives three times a week, goes grocery shopping, takes her daughter to the mall, and attempts to help with chores around the house. (R. 35). Claimant testified that she was fairly limited in all of these activities: she was unable to drive for more than approximately ten miles (R. 48), that any period of time at the mall or grocery store was limited (R. 48), that she rarely cooked (R. 48), and that she was unable to significantly contribute to household work (R. 55-56).

Many of the factors considered by the ALJ in assessing Claimant's credibility are supported by substantial evidence while three are factually incorrect. Considered by itself, it is a close question whether the ALJ's credibility assessment, as a whole, is supported by substantial evidence sufficient to be upheld. Here, however, the ALJ failed to properly weigh the medical opinions in the case, as discussed below. Where an ALJ improperly fails to weigh such medical opinions and where those opinions are "integral in determining Claimant's RFC and credibility, the ALJ should reevaluate both the RFC and credibility determinations on remand." *Prather v. Colvin*, No. 5:12-CV-171-FL, 2013

17

WL 4806958 (E.D.N.C. Sept. 9, 2013) (citing SSR 96-7p, 1996 WL 374186, at \*1; SSR 96-8p, 1996 WL 374184, at \*7 (July 2, 1996)). Therefore, it is recommended that the ALJ reconsider the credibility and RFC determinations on remand.

## II.   The ALJ's Assessment of Medical Opinion Evidence

Claimant contends the ALJ erred in evaluating the medical opinion evidence. Pl.'s Mem. at 14-20. Specifically, Claimant contends the ALJ erred in assigning only little weight to the opinions of Dr. Joseph Nutz, Dr. Kevin McKnight, and Dr. Ashraf Guirgues. *Id.* This court agrees that the ALJ failed to assign proper weight to Dr. Nutz's opinion and failed to properly assess Dr. Guirgues' opinion.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.[3] *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), she must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). Moreover, when considering the findings of state agency consultants, the ALJ must

> evaluate the findings using relevant factors . . . , such as the [consultant's] medical specialty and expertise in [the Social Security Administration's] rules, the supporting evidence in the case record, supporting explanations provided by the [consultant], and any other factors relevant to the weighing of the opinions.

20 C.F.R. § 404.1527(f)(2)(ii). The ALJ must explain the weight given to these opinions in her decision. *Id.*; *see also* SSR 96-6p, 1996 WL 374180, at *1.

The three opinions Claimant contends should have been accorded greater weight include the following: (1) Dr. Nutz's opinion from July 7, 2011, that Claimant is permanently physically disabled (R. 682-83); (2) Dr. McKnight's opinion that Claimant could not lift or carry more than ten (10) pounds (R. 637-39); and (3) Dr. Guirgues' opinion that Claimant could perform no bending, pushing, or pulling (R. 399). In discussing Dr. Nutz's opinion, the ALJ found that the assessed

---

[3] The Social Security regulations provide that all medical opinions, including opinions of examining and non-examining sources, will be evaluated considering these same factors. 20 C.F.R. §§ 404.1527(e), 416.927(e).

limitations were not supported by any objective physical or laboratory findings, that his recommendations were inconsistent with his treatment notes and that the claimant had not required any recent hospitalization. (R. 36). Claimant contends that Dr. Nutz's recommendation is in accord with the other medical opinions in the case, specifically pain specialist Dr. Susan Vettichira, and are consistent with his own treatment notes. Pl.'s Mem. at 16-17. Claimant also argues that she required recent hospitalization due to her condition. Pl.'s Mem. at 17. The ALJ discounted Dr. McKnight's opinion because he provided no objective physical or laboratory findings to support the restrictions he gave and because his opinion is inconsistent with other examining and treating physicians (outside, apparently, of Dr. Nutz). (R. 35). Claimant contends that treatment notes submitted to the Appeals Council should be considered because they pertain to the period before the ALJ made a decision and because they have a reasonable possibility of changing the outcome. Pl.'s Mem. at 17-18. The ALJ gave significant weight to Dr. Guirgues' opinion that Claimant could lift up to 20 pounds. (R. 398-400). Claimant contends that the ALJ gave significant weight to the portions of that assessment which were in accord with his RFC assessment while ignoring the other restrictions Dr. Guirgues gave her, including that she could not bend, push, or pull at all. Pl.'s Mem. at 18.

The ALJ did not properly weigh the opinion of Dr. Nutz, one of Claimant's treating physicians. The first reason the ALJ cites in giving the opinion little consideration was that there was no physical or laboratory evidence submitted to corroborate it. (R. 36). Dr. Nutz incorporated the records of Dr. Guirgues, who performed Claimant's 2008 back surgery and saw her for a number of post-surgery check-ups; Dr. Bates, who performed Claimant's carpal tunnel release procedure; Dr. Vettichira, a pain specialist who conducted a variety of tests on Claimant's back after her most

20

recent surgery; and his own opinions and observations of Claimant over the course of approximately six (6) years. (R. 682). Essentially, Dr. Nutz's opinion was substantially similar to that of the DDS doctors, who also base their opinions upon a review of the medical records of treating specialists, but with the advantage of having treated Claimant personally for approximately twelve years. Further, Claimant accurately points out that Dr. Vettichira's attempts to test portions of Claimant's back were incomplete and, therefore, did not tend to weigh against Dr. Nutz's limitations. Pl.'s Mem. at 16. While the results of the test were negative for any debilitating conditions, the test was not completed because Claimant experienced too much pain to continue. (R. 578).

Second, the ALJ discounted Dr. Nutz's assessment because it allegedly conflicted with his own treatment notes, specifically those in Exhibit 18F. (R. 36). The ALJ failed to state exactly how the ten-pound lifting limit conflicted with the notes in Exhibit 18F. The referenced exhibit is a list of treatment notes for Claimant's visits to Dr. Nutz during the period between September 29, 2010 and May 16, 2011. (R. 677-81). During that time, Claimant visited Dr. Nutz four times, twice for the purpose of alleviating her back pain. (*Id.*) During those visits, Claimant was advised to continue with her medication and, during the second visit, Claimant updated Dr. Nutz with information on potential breast reduction surgery. (R. 677; 679). While there are no specific restrictions on lifting given in the notes covering these visits, there is no substantial evidence suggesting that they are inconsistent with Dr. Nutz's limitation. Finally, the ALJ again cites Claimant's lack of recent hospitalizations as a ground for discrediting Dr. Nutz's opinion. (R. 36). As discussed above, that finding is not supported by the record because Claimant made an emergency room visit on April 25, 2011, citing intense back pain as the cause. (R. 640-46).

In fact, there are no medical records, diagnoses, or recommendations in the record which are

21

directly inconsistent with Dr. Nutz's opinion. Dr. Guirgues' opinion that claimant could lift up to 20 pounds was more than two years older than Dr. Nutz's assessment, a time during which it became apparent that Claimant's back problems were unresolved after her second surgery. *(See* R. 677; 684 (Claimant's continued complaints of lower back pain prompt consideration of breast reduction surgery in an attempt to control the problem)). The DDS findings do conflict with Dr. Nutz' opinion because they find that Claimant could lift up to 20 pounds regularly. (R. 509-17; 547-58). Given that the ALJ's grounds for assigning little weight to Dr. Nutz's opinion are not supported by the record, however, and Dr. Nutz actually treated Claimant, his opinion should have been entitled to greater weight. 20 C.F.R. § 404.1527(c)(2); *Craig,* 76 F.3d at 590.

The ALJ discounted Dr. McKnight's assessment of Claimant's limitations because he failed to provide any physical or laboratory tests to support it and because it was deemed inconsistent with the other medical records in the case. (R. 35). Along with the request to the Appeals Council, Claimant submitted Dr. McKnight's treatment notes, which provide a basis for the restrictions in his RFC assessment. (R. 4; 684-90). Claimant contends that the Appeals Council was required to consider the evidence because it was new and could reasonably have changed the outcome of the case. Pl.'s Mem. at 17-18. The regulations direct the Appeals Council to review the case "if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). The Appeals Council did not find that Dr. McKnight's treatment notes were sufficient to change the outcome of the case. (R. 1-2). The Appeals Council is required to consider such new evidence but may ultimately decline review. *Wilkins v. Sec'y, Dept. of Health & Human Servs.,* 953 F.2d 93, 95 (4th Cir. 1991). After consideration of the new evidence, the Appeals Council declined to review the case (R. 1-4), a proper course of action that

22

is not a ground for remand.

Last, the ALJ assigned great weight to Dr. Guirgues' opinion that Claimant could lift 20 pounds regularly because it is "well-supported" and consistent with the great weight of the evidence in the case. (R. 35). Claimant argues that the ALJ failed to consider other restrictions placed on Claimant by Dr. Guirgues, specifically that Claimant could do no bending, pushing, or pulling. Pl.'s Mem. at 18; R. 399. The restrictions by Dr. Guirgues, other than the weight limit, were inconsistent with the findings of the DDS professionals, who did not limit Claimant's pushing or pulling. (R. 509-17; 547-58). The ALJ failed to note the inconsistency in those opinions as well as the fact that Dr. Guirgues' opinion was, at the time of the decision, more than two years old and pre-dated conflicting medical records. (R. 35; 682-83). These are the types of factors that the law directs the ALJ to consider in making his evaluation of the evidence. *See* 20 C.F.R. § 404.1527 (directing the ALJ to consider the supportability of an opinion in light of the entire medical record).

As a general matter, the ALJ failed to adequately consider the factors for determining the weight of medical opinions. He failed to note the specialties of each of the examining and treating physicians, as the regulations require. 20 C.F.R. § 404.1527(c)(5). Dr. McKnight is a board-certified specialist in rheumatology and internal medicine (R. 248) while Dr. Nutz is a specialist in family medicine (R. 682). The DDS reviewing doctors are specialists in gynecology (R. 73; 250) and pediatrics (R. 250). The ALJ also failed to consider the length, "nature and extent of the treatment relationship[s]," between Drs. Nutz and McKnight. (R. 35-36); 20 C.F.R. § 404.1527(c)(2). Dr. Nutz has been seeing Claimant regularly since 1999 (R. 682) while Dr. McKnight had seen Claimant every two to four months since October 2010. (R. 637). Last, the ALJ failed to consider that each treating physician's opinion as to Claimant's disability supported the

23

findings of the other. 20 C.F.R. § 404.1527(c)(3). The fact that two of the doctors who had treated Claimant most extensively regarding her major alleged ailment reached the same opinion about her limitations warrants greater consideration than the ALJ provided. The ALJ failed to properly weigh the medical opinions in the case, specifically that of Dr. Nutz, Dr. Guirgues, and the DDS physicians, and therefore the case should be remanded.

## III.    The ALJ's Treatment of Claimant's Alleged Mental Impairment

Claimant contends that the ALJ failed to follow the special technique used to evaluate colorable claims of mental impairment, as required by 20 C.F.R. § 404.1520(a). Pl.'s Mem. at 20-21. Specifically, Claimant argues that because she was diagnosed with depression, treated with a variety of anti-depressant medications, and referred to a psychiatrist, she made a colorable claim and that the special technique should have been used. Pl.'s Mem. at 20.

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow the "special technique" for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a. *See Newton v. Astrue*, 559 F. Supp. 2d 662, 667 (E.D.N.C. 2008). The required analysis entails rating the degree of a claimant's functional limitation in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The first three functional areas are rated on a five-point scale: none, mild, moderate, marked and extreme. *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4). A four-point scale is used to rate the fourth functional area: none, one or two, three, and four or more. *Id.* The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *Id.*

In this case, Claimant did not list depression as impairment at either the initial or

24

reconsideration level of her administrative proceedings, has not been treated by a psychiatrist, and does not appear to claim any functional limitations as a result of her depression. (R. 211; 509-517; 547-558). The medical record shows that Claimant has taken anti-depressants (R. 637, 685, 687, 689) and suffers from stress, insomnia, and fatigue (R. 682). Claimant cites *Harrell v. Astrue*, No. 4:06-CV-00240-FL, 2008 WL 858771 (E.D.N.C. Mar. 31, 2008) as a situation with similar facts where the ALJ was directed to follow the special technique. Pl.'s Mem. at 20-21. *Harrell* differs from the instant case in several important respects. First, in *Harrell*, the plaintiff had seen a psychologist for three months and participated in a study related to depression for four months. *Harrell*, 2008 WL 858771 at \*9. Here, Claimant received prescriptions from doctors treating her for other ailments and did not seek the help of a mental health professional. Further, the plaintiff in *Harrell* testified that her depression limited her ability to work because her concentration and short-term memory were negatively affected. *Id.* The ALJ also extensively questioned the plaintiff about her depression and the treatment she had received. *Id.* By contrast, Claimant barely mentioned her depression during her hearing testimony. (R. 57; 61). She alleges no functional limitations from her depression. (*See* R. 211 (Claimant discusses her impairments and resulting functional limitations with DDS and does not mention depression)). Finally, the *Harrell* plaintiff was unrepresented prior to and during the hearing before the ALJ and did not present full records of her impairment to the ALJ. *Id.* at \*11. The court remanded, in part, because it was "unwilling to assume that unseen records would necessarily show that plaintiff's depression [was] no more serious than the ALJ found it to be" based on the record presented at the hearing. *Id.* There is no indication that the record before this court contains anything less than the full record of Claimant's history with depression, which includes only mild treatment with medication and no functional limitations. (R. 637; 685;

25

687; 689). Therefore, the ALJ did not err in failing to apply the special procedure for colorable claims of mental impairment.

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-17] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-19] be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 20th day of May 2014.

Robert B. Jones, Jr.
United States Magistrate Judge